IN RE J.P.B.

(comment: 1)

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-026-CV

IN THE INTEREST OF J.P.B., A CHILD

------------

FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1) ON REMAND

------------

This is an appeal from the termination of parental rights.  Following a jury trial in November 2003, the trial court terminated the parental rights of Lonnie and Esmeralda in their twenty-month old son, J.P.B.
(footnote: 2)  Lonnie appealed, contending that the evidence was legally and factually insufficient.  In one issue, Lonnie contends that the evidence is legally and factually insufficient to show that he knowingly placed J.P.B. in an environment which endangered the child’s physical or emotional well-being or knowingly allowed J.P.B to remain in such an environment.  Lonnie did not challenge the jury’s determination that termination of his parental rights would be in J.P.B.’s best interest.  Esmeralda appealed raising three issues.

We overruled Esmeralda’s three issues and affirmed the trial court’s judgment regarding the termination of her parental rights.
(footnote: 3)  On appeal, the supreme court affirmed our judgment as to Esmeralda.
(footnote: 4)  Because we determined that there was legally insufficient evidence from which a factfinder could reasonably form a firm belief or conviction that Lonnie knowingly placed J.P.B. or knowingly allowed J.P.B. to remain in conditions or surroundings which endangered his physical or emotional well-being, we reversed the trial court’s judgment terminating the parental rights of Lonnie and rendered judgment that the Texas Department of Protective and Regulatory Services take nothing on its claim seeking to terminate the parental rights of Lonnie to his son J.P.B.
(footnote: 5)  The supreme court determined that the evidence was legally sufficient to support termination of Lonnie’s parental rights and remanded the case to this court for a factual sufficiency review.
(footnote: 6)  We affirm.

FACTUAL BACKGROUND

At the time of trial, 
Lonnie and Esmeralda, the birth parents of J.P.B., were married.  After a difficult and complicated pregnancy, J.P.B. was born seven weeks prematurely on April 25, 2002, by caesarean section.  J.P.B. remained in the hospital until he was released to his parents on May 21, 2002.  Esmeralda stayed home to care for J.P.B. while Lonnie worked Monday through Friday from 11:30 a.m. until approximately 8:30 p.m. and every other Saturday.  Because she was recovering from her caesarean section and had difficulty getting out of bed, Esmeralda cared for J.P.B. while in bed and had his diapers and formula next to the bed with her.  At nighttime, both Lonnie and Esmeralda would care for J.P.B.

On July 19, 2002, a skeletal survey revealed that J.P.B. had suffered approximately twenty-one fractures in bones throughout his body that were in various stages of healing.  Lonnie and Esmeralda both denied that either of them had caused the injuries to J.P.B.  After doctors discovered that J.P.B. had sustained these fractures, the child was removed from Lonnie and Esmeralda’s care.  The State later sought termination of Lonnie and Esmeralda’s parental rights.

FACTUAL SUFFICIENCY OF THE EVIDENCE

Lonnie contends that the evidence is factually insufficient to support the jury’s finding that he knowingly placed or knowingly allowed J.P.B. to remain in conditions or surroundings that endangered the physical or emotional well-being of the child.  Lonnie does not challenge the factual sufficiency of the evidence to support the jury’s determination that termination of his parental rights would be in the child’s best interest.

1.  Standard of Review

A parent’s rights to “the companionship, care, custody, and management” of his or her children are constitutional interests “far more precious than any property right.”  
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); 
In re M.S.
, 115 S.W.3d 534, 547 (Tex. 2003).  
In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child’s right to inherit.  
T
EX
. F
AM
. C
ODE
 A
NN
. § 161.206(b) (Vernon Supp. 2005); 
Holick v. Smith
, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  
Holick
, 685 S.W.2d at 20-21;
 In re E.S.S.
, 131 S.W.3d 632, 636 (Tex. App.—Fort Worth 2004, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  T
EX.
 F
AM.
 C
ODE
 A
NN.
 § 161.001 (Vernon Supp. 2005)
; 
In re J.L.
, 163 S.W.3d 79, 84 (Tex. 2005).
  
Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  
Tex. Dep’t of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence.  T
EX
. F
AM
. C
ODE
 A
NN
. §§ 161.001, 161.206(a); 
In re J.F.C.
, 96 S.W.3d 256, 263 (Tex. 2002).  This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. 
 
In re G.M.
, 596 S.W.2d 846, 847 (Tex. 1980)
; 
In re K.W.
, 138 S.W.3d 420, 425 (Tex. App.—Fort Worth 2004, pet. denied).  It is defined as the “measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.”  
Tex. Fam. Code Ann.
 § 101.007 (Vernon 2002).

This higher burden of proof elevates the appellate standard of factual sufficiency review.  
In re C.H.
, 89 S.W.3d 17, 25 (Tex. 2002).
  “[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance.”  
C.H.
, 89 S.W.3d at 25.  
In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven.  
Id
.  Our inquiry here is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated one of the conduct provisions of section 161.001(1) and that the termination of the parent’s parental rights would be in the best interest of the child.  
Id
. at 28.

The distinction between legal and factual sufficiency lies in how we review the evidence.  
J.F.C.
, 96 S.W.3d at 266.  In a factual sufficiency review, in determining whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true, we must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding.  
Id.
  If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.  
Id.
  If we reverse on factual sufficiency grounds, then we must detail in our opinion why we have concluded that a reasonable factfinder could not have credited disputed evidence in favor of its finding.  
Id. 
at 266-67.

2.  Grounds for Termination

We review the evidence supporting the jury’s finding that Lonnie knowingly placed J.P.B. or knowingly allowed him to remain in conditions or surroundings which endangered his physical or emotional well-being.  
See
 
Tex. Fam. Code Ann. 
§ 161.001(1)(D) (Vernon Supp. 2005).
(footnote: 7)  Family code section 161.001(1)(D) permits a court to order termination if it finds by clear and convincing evidence that the parent has “knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child.”  
Id.

3.  Review of the Evidence Presented

Lonnie testified that on May 23, 2002, he and Esmeralda took J.P.B. for a follow-up appointment at PediPlace.  On May 31, 2002, J.P.B. saw Dr. Fitzgerald at PediPlace, who diagnosed J.P.B. with thrush
(footnote: 8) and prescribed an antibiotic.  Sometime during the month of June, J.P.B. had a  blood test done at a hospital in Lewisville and another blood test performed at a clinic in Lewisville.  Lonnie testified that at no time during those two appointments did any doctor inform him that J.P.B. was acting abnormally in any way.  On June 28, 2002, J.P.B. received immunizations at PediPlace.  Lonnie testified that he informed the doctor that J.P.B. was crying all the time, and the doctor performed an examination of J.P.B. but told Lonnie that J.P.B. was still suffering from thrush.  Lonnie testified that the doctor examined J.P.B.’s arms and legs, but the doctor never commented that he saw any abnormalities in them.

Lonnie testified that around July 1, 2002, he noticed that J.P.B. did not move or kick his leg and was constantly crying.  Therefore, on that date, Lonnie took J.P.B. to Trinity Medical Center (Trinity).  He testified that he noticed that one of J.P.B.’s legs was swollen and that he thought it may have been an allergic reaction to the immunization shots that J.P.B. had recently received. According to Lonnie, the doctors took x-rays of J.P.B. but did not mention anything about fractures.  He testified that the doctors at Trinity instructed Lonnie and Esmeralda to give J.P.B. suppositories for constipation.  Dr. Farah Naz testified that she was aware that J.P.B. went to Trinity on or around July 1, 2002, but he was not admitted to the hospital and she was unaware whether x-rays were taken of J.P.B. at that time.

Lonnie and Esmeralda again took J.P.B. to Trinity on July 7, 2002, because Lonnie noted that the child was again crying and was having bowel problems.  Dr. Naz testified that she received a call from Trinity Hospital on July 7, 2002.  The hospital physician informed her that J.P.B. had swelling in his right thigh, and the emergency room physician had seen him twice that week with the same problem, but now he was even more irritable and fussy, and the swelling looked worse.  When Dr. Naz examined him at Trinity, she noticed that his right leg would not move very much, and he would flinch when she touched it.  A bone scan and ultrasound were performed on J.P.B.; the result of the bone scan was normal and the result of the ultrasound showed inflammation of the muscle.

Lonnie testified that after the doctors took x-rays of J.P.B.’s leg on July 7, 2002, they never mentioned anything about fractures.  He also testified that the doctors at Trinity never mentioned to him that it appeared that J.P.B. was abused.  Dr. Naz transferred J.P.B. to Children’s Medical Center in Dallas (Children’s) on July 12, 2002, to have an MRI.  However, physicians at Children’s performed a spinal tap, rather than an MRI.  When doctors at Children’s released J.P.B. on July 15, 2002, they had diagnosed him with myositis, or muscle inflammation, and prescribed medication to treat it.

Lonnie testified that when he asked the doctors at Children’s whether they had performed an MRI on J.P.B., the  doctors informed him that they decided that J.P.B. did not need an MRI.  Lonnie testified that the first time he heard J.P.B. shriek in pain was when the doctors at Children’s performed the spinal tap.

Dr. Naz testified that after J.P.B.’s release from Children’s, a nurse employed by her clinic called and scheduled an appointment for J.P.B. at the clinic because Dr. Naz had read the discharge summary from Children’s and noted that an MRI was not performed on J.P.B.  Lonnie testified that he did not recall whether a nurse from Dr. Naz’s office called to schedule the July 19, 2002 appointment or whether he was the one to call and schedule the appointment, but he testified that he took J.P.B. to the appointment.  Dr. Naz testified that at the appointment, Lonnie was concerned that J.P.B. was not moving his leg and was not getting better.  Lonnie testified that when he informed Dr. Naz that Children’s did not perform the requested MRI, she again made arrangements for J.P.B. to get an MRI at Children’s.  She also testified that Lonnie was attentive, and when she saw both parents together, he was the one answering questions, while Esmeralda was more passive.  Dr. Naz expressed her concern that both parents were uneducated about problems associated with a premature baby.  Dr. Naz sent J.P.B. to the emergency room at Children’s to have an MRI performed because Trinity did not have the capabilities to perform an MRI on babies.

On July 19, 2002, at Children’s, an x-ray was taken of J.P.B.’s right leg, which revealed a fracture.  Because this fracture was revealed, a skeletal survey was ordered and performed on J.P.B. to determine whether any other parts of his body were injured.  The skeletal survey revealed multiple old healing fractures in the ribs, femur, radius, and ulnar.  According to Dr. Thomas Abramo,  these fractures were likely caused by yanking J.P.B.’s leg, picking him up by the thigh or femur, or throwing him against something.  He testified that the fractures were at various stages of healing and could be anywhere from seven days to four weeks old.

He testified that because of the various stages at which the fractures were healing, it was likely that J.P.B. had been physically battered multiple times.  He testified that a child with a femur fracture would be intensely fussy and constantly crying and that changing diapers would have caused extensive pain for the child.  In his opinion, a parent without medical training would know that the child was injured by this type of high-pitched, constant, and intense cry.

Dr. Eugene Sheffield, who specializes in pediatric radiology, testified that the x-ray taken on July 7, 2002, at Trinity reveals an acute fracture in J.P.B.’s eighth rib on his left side that appeared to have occurred within one to two days of when the x-ray was taken, or on the 5th, 6th or 7th of July.  Lonnie testified that he was off work on July 4th through 7th, the dates that Dr. Sheffield testified that the rib injuries likely occurred.  Dr. Sheffield also found additional rib fractures when reviewing the x-rays taken by Children’s on July 19, 2002 that were between two and four weeks old as of that date.  Lonnie had no explanation for how the rib injuries occurred to J.P.B.

Dr. Sheffield also reviewed the x-rays taken of J.P.B.  When testifying regarding the injury to J.P.B.’s arm, Dr. Sheffield explained that a bruise may or may not have appeared on the child depending on whether he sustained a direct blow or whether the injury was a yanking-type injury.  He testified that these fractures could not have been caused by the usual activities of daily living, such as changing a child’s diaper.  Dr. Sheffield also testified that the fracture in the right leg could not have been caused by immunizations because dramatically more force would have been applied to cause the fracture.  In his opinion, it is likely that the fracture to the femur was caused by a direct blow to J.P.B.’s leg or by someone trying to snap the limb.  He also testified that the fractures were in various stages of healing, meaning that they had occurred at different times, which is indicative of child abuse.

Esmeralda testified that J.P.B. cried all the time, from the first time he came home from the hospital after he was born.  She testified that she was able to console his cries.  She was unable to recall whether she took J.P.B. to see a doctor between the time he was initially released from the hospital on May 21, 2002, and the July 7, 2002 visit to Trinity when J.P.B. saw Dr. Naz. Esmeralda denied that either she or her husband caused the injuries to J.P.B., although she acknowledged that she and her husband were the only two people who had access to the child.  Esmerelda suggested that the doctors or nurses at the hospital inflicted the injuries to J.P.B. when the staff would take him for a procedure, such as an x-ray or a bone scan.

Esmeralda testified that she never saw Lonnie do anything harmful to J.P.B.  She testified that Lonnie expressed his concern that J.P.B. was in some kind of pain because J.P.B. was crying.  She recalled that Lonnie took J.P.B. to PediPlace one time without her.  She testified that she informed Lonnie that J.P.B. was constantly crying.  She testified that the doctors at Trinity informed her that nothing was wrong with J.P.B, other than inflammation of the leg.

Dr. Mark Foster, a clinical and forensic psychologist appointed by the court to evaluate Lonnie and Esmeralda, testified that Lonnie was very defensive and tried to portray himself during the evaluation in a positive light, more so than the average person.  He also testified that Lonnie is the kind of person who would be resistant to ”rocking the boat” or confronting a situation head-on.

Susan Gleghorn, a Court Appointed Special Advocate (CASA) volunteer who reviewed J.P.B.’s case, testified and recommended that Lonnie and Esmeralda’s parental rights be terminated.  She stated that in her review of J.P.B.’s case, she concluded that Esmeralda abused her child and that Lonnie possibly did, too.  Although she did acknowledge that she thought it was reasonable for Lonnie to rely on what the medical professionals were telling him, she knew that Lonnie lived in the home.  She testified that it was her opinion that Lonnie should have known that there was something desperately wrong because he lived in the house with J.P.B. and Esmeralda.

Tonya Vossekuil, an investigator for TDPRS, interviewed Lonnie and Esmeralda in conjunction with the investigation of J.P.B.’s case at Children’s after the fractures were discovered.  She testified that when she interviewed Lonnie, he stated that J.P.B. had been very fussy for the preceding three to four weeks, especially when he changed the child’s diaper, and he did not know what was wrong with him. Cassidy Baker, a social worker for TDPRS, testified that she recommended that the parental rights of both Lonnie and Esmeralda be terminated because, although the department does not know who inflicted the injuries, both parents either placed the child in a situation where he could be harmed or failed to remove him from a situation where he could be harmed.

Lonnie testified that when he was informed of the fractures in J.P.B.’s bones, he initially believed that a bone disease caused the fractures, and at the time of trial he still was unaware of whether the child actually has a bone disease.  Esmeralda informed Dr. Foster during his evaluation of her that she believed that J.P.B. sustained these injuries as a result of having a bone disease.  Esmeralda later testified that she did not think that J.P.B. sustained these fractures as a result of a bone disease and that J.P.B. does not have a bone disease.  After J.P.B was removed from Lonnie and Esmeralda’s home and was in the care of Lonnie’s parents, Lonnie, Sr. and Karen, Lonnie, Sr. and Karen took the child to Houston to have tests performed to determine whether the child suffered from a bone disease.  At the time of trial Lonnie Sr. and Karen were unwilling to rule out the possibility that he did not have a bone disease because, according to them, all the tests had not been completed.  However, Dr. Sheffield testified that, by looking at the x-rays, he determined that J.P.B. does not have a bone disease and had appropriate bone density for his age.

4.  Application of Law to Facts

Lonnie cites 
In re D.P.
 to support his contention that the evidence is factually insufficient to support termination of his parental rights.  
See
 96 S.W.3d 333, 338-39 (Tex. App.—Amarillo 2001, no pet.).  The State contends that the present case is distinguishable from 
D.P.
 because here much more circumstantial evidence was presented to produce a firm belief or conviction in the mind of a rational trier of fact that Lonnie knowingly placed or allowed J.P.B. to remain in an environment that endangered his physical and emotional well-being.  
See id.
  We find that 
D.P.
 is distinguishable from the present case because in
 D.P.
, there was evidence that the child was in the care of a baby-sitter, as well as the mother and another male who resided in the home.  
See id.
 at 335, 339.  The evidence reveals that Lonnie and Esmrealda shared in J.P.B.’s care, and no other person served as J.P.B.’s primary caregiver. Although Esmeralda testified that she believed the medical staff at either Trinity or Children’s caused these injuries to J.P.B., Dr. Sheffield negated the possibility that the hospital staff caused these injuries because the technicians generally work in groups of two or three.

Based on Dr. Sheffield’s review of the July 7, 2002 x-ray from Trinity, J.P.B. had at least one rib fracture that likely occurred between July 4 and July 7, 2002, a time when Lonnie testified that he and Esmeralda were home alone with J.P.B.  Additionally, the evidence demonstrates that the twenty-one fractures, which were likely caused by excessive force, would have caused J.P.B. to emit high-pitched screams that the parents should have noticed.  The evidence also indicates that J.P.B. sustained these fractures over a period of time and that they were a result of ongoing mistreatment.  Finally, Lonnie left the constantly crying child at home alone with Esmeralda during the day, and Esmeralda testified that she and Lonnie had total care of J.P.B.

The jury, which is solely responsible for determinations of credibility and demeanor, heard testimony that Lonnie is the kind of person who would be resistant to ”rocking the boat” or confronting a situation head-on.  Furthermore, although the doctors treating J.P.B. initially failed to diagnose the fractures, these doctors did not live in the home, and the jury heard testimony from the CASA volunteer that it was her opinion that Lonnie should have known that something was desperately wrong.  Lonnie hired a criminal defense lawyer on July 22, 2002, three days following the discovery of the fractures, and he testified that he hired the lawyer because he was concerned with whether he and his wife were going to be charged with a crime.  Based on the foregoing testimony, the jury could rationally determine that Lonnie was in fact attempting to hide his knowledge of how these injuries were inflicted upon J.P.B.

Additionally, the supreme court has opined that although Lonnie may have reacted appropriately to symptoms of abuse, the evidence supports a finding that he knowingly failed to ameliorate the underlying cause.  
In re J.P.B.
, 180 S.W.3d at 574.

After reviewing all of the evidence, we conclude that the evidence supports the jury’s finding by clear and convincing evidence that Lonnie knowingly placed or allowed J.P.B. to remain in conditions or surroundings that endangered his physical or emotional well-being.  Accordingly, we hold that the evidence is such that a factfinder could reasonably form a firm belief or conviction that the ground for termination was proven.  We overrule Lonnie’s sole issue.

CONCLUSION

Having overruled Lonnie’s sole issue, we affirm the trial court’s judgment.

DIXON W. HOLMAN

JUSTICE

PANEL B:  HOLMAN, WALKER, and MCCOY, JJ.

WALKER, J. filed a dissenting opinion.

DELIVERED:  May 4, 2006

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-26-CV

IN THE INTEREST OF J.P.B., A CHILD

------------

FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

------------

DISSENTING OPINION ON REMAND 

------------

Because there was factually insufficient evidence to support the jury’s finding that Appellant Lonnie’s parental rights should be terminated, I respectfully dissent.
  
Giving due consideration to evidence that the jury reasonably could have found to be clear and convincing, I would hold that the jury could not have reasonably formed a firm belief or conviction that Lonnie 
knowingly 
placed J.P.B. or 
knowingly 
allowed J.P.B. to remain in conditions that endangered his physical or emotional well-being.  
See
 
Tex. Fam. Code Ann.
§ 161.001(1)(D) (Vernon Supp. 2005); 
In re C.H.
, 89 S.W.3d 17, 25 (Tex. 2002); 
In re J.T.G.
, 121 S.W.3d 117, 124 (Tex. App.—Fort Worth 2003, no pet.).

A parent’s rights to “the companionship, care, custody, and management” of his or her children are constitutional interests “far more precious than any property right.”  
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); 
In re M.S.
, 115 S.W.3d 534, 547 (Tex. 2003).  Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence.  T
EX
. F
AM
. C
ODE
 A
NN
. §§ 161.001, 161.206(a); 
In re J.F.C.
, 96 S.W.3d 256, 263 (Tex. 2002).  “[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance.”  
C.H.
, 89 S.W.3d at 25.  In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven.  
Id
.

In determining a factual sufficiency point, we must give due consideration to evidence that the trier of fact could reasonably have found to be clear and convincing and then determine whether, based on the entire record, a factfinder could reasonably form a firm conviction or belief that its finding was true.  
C.H.
, 89 S.W.3d at 25.  We must consider all the evidence in the record, both that in support of and contrary to the trial court’s findings.  
C.H.
, 89 S.W.3d at 27-29.

Here, the jury found that Lonnie did not engage in conduct or knowingly place J.P.B. with persons who engaged in conduct that endangered J.P.B.’s physical or emotional well-being.  Thus, our only inquiry is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that Lonnie knowingly placed J.P.B. or knowingly allowed J.P.B. to remain in conditions or surroundings that endangered his physical or emotional well-being.  
Id
. at 28.  The following chart demonstrates the evidence supporting and contradicting the jury’s finding that Lonnie knowingly placed J.P.B. or knowingly allowed J.P.B. to remain in conditions or surroundings that endangered his physical or emotional well-being.

Evidence Against Finding

Evidence Supporting Finding

Lonnie quit school in the tenth grade and obtained his GED.  He testified that he has no medical training.

Before Esmeralda had J.P.B., Lonnie and Esmeralda had one unplanned pregnancy, but she had a miscarriage.  The couple planned their second pregnancy with J.P.B.  They understood that because of Esmeralda’s long-term diabetes, her pregnancy would be difficult and would put her life at risk.  But both were willing to take this risk in order to have a baby.

J.P.B. was born seven weeks prematurely.  J.P.B. stayed in the hospital for one month after his birth.

After J.P.B. was born Lonnie bought bought gum cigars and passed them out to his friends; he also bragged to everyone at work that he had a baby boy.

Lonnie worked Monday through Friday from 11:30 a.m. until approximately 8:30 p.m. and every other Saturday.  Every evening when Lonnie came home from work, he and Esmeralda would go to the hospital, stay three to four hours, and return home to sleep there for the rest of the night.

J.P.B. was released from the hospital on May 21, 2002.  Esmeralda stayed home with J.P.B. while Lonnie worked.

Esmeralda testified that from the moment they took J.P.B. home, he cried constantly, especially when she changed his diapers.

Lonnie took J.P.B. to either a doctor’s office or a hospital eight times between May 23, 2002 and July 19, 2002.  Until July 19th, no doctor or any other hospital personnel informed Lonnie that J.P.B. had any abnormalities other than those specifically discussed below, and Lonnie testified that he believed what all the doctors said about J.P.B.

On May 23, 2002,  Lonnie and Esmeralda took J.P.B. to PediPlace for a follow-up.  The doctors did not express any concerns about J.P.B. at that time.

On May 31, 2002, Lonnie took J.P.B. to PediPlace for another follow-up and told the doctor that J.P.B. was crying alot; the doctor diagnosed that J.P.B. had thrush and explained that J.P.B. was probably crying because he had thrush.  The doctor had no other concerns about J.P.B. and did not see any abnormalities.  The doctor prescribed an antibiotic for thrush. Lonnie testified that at that time, he did not notice anything abnormal about the way J.P.B. moved his arms or legs.

In the middle of June, Lonnie and Esmeralda took J.P.B. to a hospital for blood tests.  Lonnie told the doctor that J.P.B. was crying alot but that another doctor had recently diagnosed J.P.B. with thrush and had prescribed an antibiotic.  Lonnie testified that none of the medical personnel commented that J.P.B. was behaving abnormally in any way.

In mid- to late June, Lonnie and Esmeralda took J.P.B. to a specialty clinic for another blood test.  J.P.B. was crying, and a doctor helped the parents try to pacify J.P.B. because the doctor was drawing blood.  No medical personnel told either parent that J.P.B. was acting abnormally or that he needed any other treatments.

On June 28, 2002, Lonnie took J.P.B. to PediPlace for immunization shots.  Lonnie told the doctor that J.P.B. was crying all the time, but the doctor examined J.P.B. and told Lonnie that J.P.B. was still suffering from thrush.  Lonnie testified that during the examination, the doctor moved J.P.B.’s arms and legs to see if he had good reflexes and that the doctor never said he saw any abnormalities in J.P.B.

On July 1, 2002, Lonnie took J.P.B to the emergency room because he was constipated, was crying alot, and his leg was swollen.  Lonnie testified that the doctors took x-rays but that they did not diagnose any fractures.  Lonnie testified that J.P.B.  was diagnosed with “gas  bubbles inside his stomach” and that the hospital staff gave Lonnie some suppositories to give J.P.B. Lonnie testified that a doctor examined J.P.B. and did not express any concerns that J.P.B. had any abnormalities.  Lonnie testified that he relied on the doctor’s advice.

On July 7, 2002, Lonnie again took J.P.B. to the emergency room because he was crying and constipated.  J.P.B.’s leg was still swollen, and the hospital staff took x-rays of his leg, a bone scan, and an ultrasound.  Medical personnel showed Lonnie the x-rays but did not tell Lonnie that they saw any fractures.  Dr. Naz examined J.P.B. but did not state that J.P.B. had any abnormalities.  Dr. Naz testified that J.P.B. was moving his legs less than normal and would flinch slightly when she dealt with his right leg.  J.P.B. was admitted to the hospital that day because the hospital staff did not know why his leg was swollen, and J.P.B. stayed at the hospital for three days.

Dr. Naz testified that Lonnie was concerned that J.P.B. was not moving his leg, that Lonnie was attentive, and that he answered questions.

On July 12, 2002, Dr. Naz transferred J.P.B. to a children’s hospital to have an MRI because the children’s hospital was better equipped to do MRIs on children. However, medical personnel at the children’s hospital did not do an MRI on J.P.B.; instead, they did a spinal tap to determine whether J.P.B. had cystic fibrosis.  The doctors at the children’s hospital diagnosed J.P.B. with myositis, which is muscle inflammation, and prescribed a medicine to treat it. The hospital discharged J.P.B. on July 15, 2002.  Lonnie testified that before J.P.B. was released, he asked the hospital staff whether they were going to do an MRI on J.P.B. and that the staff told him that J.P.B. did not need an MRI.

Lonnie took J.P.B. to Dr. Naz on July 19, 2002, for a follow-up visit. J.P.B.’s leg was still swollen, and Dr. Naz examined it.  Lonnie told Dr. Naz that the staff at the children’s hospital did not do an MRI, and Dr. Naz had Lonnie take J.P.B. back to the children’s hospital for an MRI.  Lonnie picked up Esmeralda from home, and the two took J.P.B. to the children’s hospital.  Medical personnel at the children’s hospital took two sets of x-rays of J.P.B.’s legs.  After almost ten hours in the hospital, a doctor informed Lonnie and Esmeralda that they had found fractures in J.P.B.’s x-rays.  This was the first time that any medical professional told Lonnie that J.P.B. had fractured bones and the first time that anyone suggested that J.P.B. had been abused.

Although the State introduced five x-rays of J.P.B.’s body, neither Lonnie nor the State introduced into evidence the majority of J.P.B.’s medical records, which could support or disprove Lonnie’s testimony about what he told the doctors during each of his visits.  But the State, not Lonnie, had the burden of proof.  
See J.F.C.
, 96 S.W.3d at 263.

Lonnie introduced a record of J.P.B.’s June 28, 2002, visit to PediPlace for immunization shots, which included a handwritten note that the parents were concerned that J.P.B. was “fussy after feeds all the time.”  Lonnie also introduced the discharge instructions from J.P.B.’s July 15, 2002, hospital visit that diagnosed J.P.B. with myositis.

Esmeralda testified that Lonnie was worried about J.P.B. because he was always crying and that she never saw Lonnie get angry or frustrated with J.P.B. when J.P.B. would cry.

A TDPRS investigator who investigated the allegation that J.P.B. was abused testified that Lonnie told her J.P.B. had been very fussy over the past three to four weeks, especially when he changed the child’s diapers, and that Lonnie did not know what was wrong with J.P.B.

Lonnie testified that he and his wife, Esmeralda, were the only people with unlimited access to J.P.B.

A July 7, 2002 x-ray revealed that J.P.B. suffered rib fractures that likely occurred between July 5, 2002 and July 7, 2002.  Lonnie testified that he was off work during those dates and that he and Esmeralda were home alone with J.P.B.

TDPRS’s radiology expert, Dr. Eugene Sheffield, testified that twenty-one fractures were detected in J.P.B.’s July 19, 2002 skeletal survey and that the fractures were approximately two to four weeks old and were at various stages of healing.

Dr. Thomas Abramo testified that a parent should have known that something was wrong with a child with such injuries and should have heard high-pitched screams from the child.

Although Lonnie testified that he told J.P.B.’s doctor that J.P.B.’s leg was swollen during the July 1st and 7th hospital visits, J.P.B.’s doctor testified that she did not think Lonnie pointed out any swelling in J.P.B.’s legs during either visit.

A psychologist who interviewed Lonnie after Child Protective Services took J.P.B. into custody testified that Lonnie was very defensive and that he is the type of person who would be resistant to “rocking the boat” and could be resistant to confronting a situation head on if he needed to know something.

The above chart demonstrates that, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of its finding is so significant that a factfinder could not have reasonably formed a firm conviction or belief in the truth of its finding.  
See J.F.C.
, 96 S.W.3d at 266.  The evidence supporting the finding permits an inference that Lonnie 
should have known 
that J.P.B. was somehow injured in his surroundings, but the State had to prove by clear and convincing evidence that Lonnie 
knowingly placed
 J.P.B. or 
knowingly
 
allowed
 J.P.B. to remain in conditions that endangered his physical or emotional well-being.  
See 
T
EX
. F
AM
. C
ODE
 A
NN
. §§ 161.001, 161.206(a);
 J.F.C.
, 96 S.W.3d at 263; 
In re D.P.
, 96 S.W.3d 333, 338-39 (Tex. App.—Amarillo 2001, no pet.) (holding that factually insufficient evidence existed to support finding that mother acted knowingly when the child’s injuries were internal and when there was no direct evidence as to how or when the child sustained the injuries or who injured the child).  Because the jury failed to find that Lonnie caused J.P.B.’s injuries and failed to find that Lonnie knowingly placed J.P.B. with persons who caused J.P.B.’s injuries, it is especially difficult to understand how, based on the evidence, the jury could have reasonably formed a firm conviction or belief that Lonnie  knowingly placed J.P.B. or knowingly allowed J.P.B. to remain in conditions or surroundings that endangered J.P.B.’s physical or emotional well-being.  That is, the jury failed to find that Lonnie caused the fractures and failed to find that Lonnie knew Esmeralda was causing the fractures, but nonetheless found that Lonnie placed or allowed J.P.B. to remain in detrimental conditions or surroundings.

Lonnie took premature J.P.B. to doctors eight times in less than two months—four of the doctor’s visits occurred during the two to four weeks when the fractures allegedly occurred—and doctors failed to notice any bruising or abnormalities with J.P.B.  Yet the majority holds that Lonnie—who received his GED and has no medical training—should have been able to determine what the doctors did not, that J.P.B. was suffering from fractured bones indicating that the conditions or surroundings in which J.P.B. was placed were endangering him.  Viewing the evidence under the appropriate standard of review, I would hold that, on the entire record, a factfinder could not reasonably have formed a firm conviction or belief that Lonnie knowingly placed or knowingly allowed J.P.B. to remain in conditions that endangered his physical or emotional well-being.  
See
 
Tex. Fam. Code Ann.
§ 161.001(1)(D); 
C.H.
, 89 S.W.3d at 25;
 
J.T.G.
, 121 S.W.3d at 124.  I would sustain Lonnie’s issue and remand the case concerning termination of Lonnie’s parental rights on this basis for a new trial.

SUE WALKER

JUSTICE

DELIVERED:  May 4, 2006

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
To protect the privacy of the parties involved in this appeal, we identify the child by initials only and Appellants by first names only.  
See
 
Tex. Fam. Code Ann. 
§ 109.002(d) (Vernon 2002). 

3:
In re J.P.B.
, No. 2-04-026-CV, 2005 WL 327168, at *3-*9 (Tex. App.—Fort Worth Feb. 10, 2005, pet. granted), 
aff’d in part, rev’d in part
, 180 S.W.3d 570 (Tex. 2005).

4: 
In re J.P.B.
, 180 S.W.3d at 575.

5:
In re J.P.B.
, 2005 WL 327168, at *10-*11.

6:
In re J.P.B.
, 180 S.W.3d at 573-74.

7: The jury answered “yes” to the question of whether they found by clear and convincing evidence that Lonnie “knowingly placed or knowingly allowed the child, [J.P.B.], to remain in conditions or surroundings which endangered the physical or emotional well-being of the child.”  The jury charge also included a question asking the jury whether it found by clear and convincing evidence that Lonnie “engaged in conduct, or knowingly placed the child, [J.P.B.], with persons who engaged in conduct, which endangered the physical or emotional well-being of the child.”  The jury answered the question in Lonnie’s favor.

8:
Thrush is a disease caused by a fungus, Candida albicans, that occurs most often in infants and children, characterized by small, whitish eruptions in the oral cavity. 
Webster’s Third New Int’l Dictionary of the English Language
 2386 (3rd ed. 2002).

COMMENTS AND ANNOTATIONS
Comment 1:
MAJORITY BY JUSTICE HOLMAN, DISSENT BY JUSTICE WALKER